IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 20, 2019

IN RE KADEN W.

**Appeal from the Juvenile Court for Anderson County**
**No. J32585/17-1904       Brian J. Hunt, Judge**

_____

**No. E2018-00983-COA-R3-PT**

_____

This is a termination of parental rights case involving the parental rights of the mother, Tora W. ("Mother"), to her minor child, Kaden W. ("the Child"), who was eleven years old at the time of trial. On January 19, 2017, the Anderson County Juvenile Court ("trial court") found that the Child was dependent and neglected and entered an order removing the Child from Mother's custody and placing the Child into the temporary legal custody of the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where he remained at the time of trial. On December 20, 2017, DCS filed a petition to terminate the parental rights of Mother.[1] Following a bench trial, the trial court terminated Mother's parental rights to the Child upon determining by clear and convincing evidence that (1) Mother had abandoned the Child by failing to provide a suitable home for him, (2) Mother had not substantially complied with the reasonable requirements of the permanency plans, and (3) the conditions leading to the Child's removal from Mother's custody persisted. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Matthew Birdwell, Oak Ridge, Tennessee, for the appellant, Tora W.

---

[1] Upon DCS's petition, the trial court terminated the biological father's parental rights to the Child following the trial on March 27, 2018. The father is not participating in this appeal; therefore, we will confine our analysis to those facts relevant to Mother.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I. Factual and Procedural Background

Mother and the Child were previously involved with DCS and the trial court in 2015 when DCS filed a "Petition to Transfer Temporary Legal Custody." In its petition, DCS requested that the court find the Child to be dependent and neglected and place custody of the Child with a proposed legal custodian, E.S.[2] The trial court subsequently placed the Child into the custody of his biological father, Navy S. ("Father"), on May 22, 2015. The adjudicatory hearing was continued more than once to allow Mother to work with DCS's Family Support Services or to allow the attorneys and parties to prepare for the upcoming adjudicatory hearing. On September 3, 2015, DCS voluntarily dismissed its "Petition to Transfer Temporary Legal Custody," and the trial court restored custody of the Child to Mother.

On March 29, 2016, DCS filed a "Petition for Order Controlling Conduct & For Protective Supervision," requesting that the trial court find the Child dependent and neglected, as well as to request that the trial court "require protective supervision" and "control the conduct of the [parents]."[3] In its petition, DCS alleged, *inter alia*, that Mother had not taken the Child to the doctor to obtain his prescription medication for his severe ADHD and that the Child was having difficulty in school since returning to Mother's custody. The trial court subsequently entered an order requiring that Mother comply with the "non-custodial permanency plan" as follows:

> The mother shall complete a Mental Health Assessment, a parenting assessment, and follow the recommendations from both assessments. The mother shall maintain stable housing, keep [the Child's] doctor's appointments and ensure he takes all medications as prescribed. [The Child] shall not have any unexcused tardies or unexcused absences from school, and shall bring all of his grades up to passing, and that the mother shall attend all parent/teacher conferences as requested by the school.

---

[2] This petition also involved M.S., who is the Child's half-sibling. The proposed legal custodian, E.S., is the biological father of M.S.

[3] This petition also involved the Child's half-sibling, M.S., who is not involved in this termination of parental rights proceeding.

[Mother] shall work with in home services as long as necessary and comply with DCS.

An adjudicatory hearing was ultimately conducted on January 19, 2017. The trial court entered an adjudicatory and dispositional hearing order on the date of the hearing, reflecting that Mother waived her adjudicatory hearing and stipulated that the Child had "improper guardianship at the time of removal by the Mother – [Tennessee Code Annotated §] 37-1-102(b)(13)(F)." The trial court therefore found the Child to be dependent and neglected. Consequently, Mother's parenting time with the Child was restricted to supervised visitation at that time.

Also on January 19, 2017, the trial court entered a bench order, removing the Child from Mother's custody and placing the Child in the physical and legal custody of DCS. The trial court stated in its bench order that probable cause indicated that the Child was dependent and neglected. The court also determined that continuation of Mother's custody was contrary to the Child's proper welfare because Mother "tested positive for amphetamine and methadone at court [on January 19, 2017,] and has been noncompliant with both the order controlling conduct and [the Family Support Services] case in regards to completing drug treatment and making sure the child receives his medication and based upon the unavailability of the father." In turn, the trial court concluded that DCS had made reasonable efforts to prevent the Child's removal from Mother's home, including parenting classes, drug and alcohol counseling for Mother, intensive case management, residential treatment for Mother, "court-ordered services (FSS case) and [a] petition for order controlling conduct."

Following the Child's placement into DCS custody, DCS developed permanency plans on February 9, 2017, and September 8, 2017, which included requirements for Mother to complete. The trial court approved the permanency plans on March 7, 2017, and October 10, 2017, respectively, finding the requirements to be reasonably related to the reasons the Child had been removed from Mother's custody.

Shortly after the Child entered foster care, Mother completed an inpatient drug and alcohol detoxification program at Centerpointe, which had begun on January 26, 2017, and continued through February 5, 2017. Upon Mother's release from Centerpointe, Mother was to complete intensive outpatient treatment, attend Alcoholics Anonymous/Narcotics Anonymous ("AA/NA") meetings, and complete aftercare. On February 9, 2017, Mother tested positive on a drug screen for benzodiazepines and buprenorphine but held prescriptions for those medications from Centerpointe.

Mother completed a psychological evaluation on March 7, 2017, performed by H. Abraham Brietstein, Ph.D., a clinical psychologist. In his psychological evaluation report, Dr. Brietstein concluded as follows:

- 3 -

**SUMMARY AND RECOMMENDATIONS:** [Mother] was referred due to failing a recent drug screen, which resulted in the removal of her children from her care. She has a long history of drug addiction involving opioids and obtained methadone for a number of years from a clinic that sounds as if it had questionable practices. Her children have also been removed in the past although they were returned. [Mother] has always lived with her mother, although she has 2 children by 2 different m[e]n, and her youngest child is now in his father's care. She is noted to function at a very low level and appears to meet the criteria for intellectual disability. As such, her intellectual limitations contribute to her poor parenting practices, affecting her ability to make appropriate judgments on their behalf. She has received SSI [Supplemental Security Income] benefits secondary to suffering a brain injury at the age of 9 when the bicycle she was [riding] was struck by a minivan. She supports herself on the disability benefits and has only briefly been employed. Her personality is one in which she is antagonistic toward authority figures, including DCS, and is generally suspicious and distrustful of other people's motives, which further complicates her ability to benefit from their services. Based on the above, the following are some recommendations:

1. [Mother] should be involved in outpatient drug rehabilitation in order to remain clean and should be able to pass random drug screens on a consistent basis before having her children returned.

2. [Mother's] mother should also participate in drug rehabilitation and be able to pass random drug screens if [Mother] continues to live with her mother.

3. Parenting classes need to be provided at a more basic level for her to benefit from them.

4. A parenting or bonding assessment should be completed to determine the extent to which the children are attached to their mother.

5. Should [Mother] fail to successfully complete the above recommendations, termination of parental rights should be considered.

On October 10, 2017, Mother participated in a drug screen and proved negative for all tested substances. On October 13, 2017, however, Mother tested positive on a

- 4 -

nail-bed drug screen for methamphetamine, the results of which included up to a six-month timeframe preceding the test. On October 31, 2017, Mother completed an alcohol and drug assessment. During the assessment, Mother participated in an additional drug screen, testing positive for cocaine, amphetamines, methamphetamine, and alcohol. The assessor accordingly recommended that Mother complete intensive outpatient treatment, continue compliance with her mental health service provider, participate in a twelve-step program, and participate in an aftercare program.

Cody Kinser, the DCS family service worker for the family from January 19, 2017, through November 2017, testified during trial that Mother was participating in the case "for the most part" after the Child entered DCS custody. He further explained that she had stable housing during that time and was residing with the maternal grandmother ("Grandmother"). Mr. Kinser also related that DCS had concerns that Grandmother had substance abuse issues. According to Mr. Kinser, although Mother had completed a psychological evaluation and an alcohol and drug assessment while he was working on the case, Mother had failed to complete the recommendations therefrom, including parenting classes and intensive outpatient drug treatment.

Concerning DCS efforts, Mr. Kinser additionally reported that he had referred Mother to the service provider for the alcohol and drug assessment, maintained regular contact with Mother during that time, offered random drug screens to Mother, and offered her encouragement and recommendations. DCS also had submitted "PSGs," case services funded by the state, to pay for Mother's psychological evaluation, psychological services, therapeutic supervised visits, ETHRA transportation, and parenting classes.

DCS family service worker, Desiree Shelton, assumed responsibility for the case in November 2017, following Mr. Kinser's transfer to a different position within DCS. Ms. Shelton remained the caseworker thereafter. During trial, Ms. Shelton testified that when she was assigned the case, Mother still needed to complete intensive outpatient treatment, complete parenting classes, and provide proof of transportation. Ms. Shelton noted that she had attempted to assist Mother with gaining admittance into an intensive outpatient program for drug treatment. Furthermore, Ms. Shelton had spoken to the service provider offering parenting classes, instructing that the provider "may need to go slower with her and to be more . . . one-on-one and personal." According to Ms. Shelton, the service provider had not received a response from Mother after contacting her.

On January 12, 2018, Mother tested positive on a drug screen for amphetamines and methamphetamine. Concerning the event, Ms. Shelton related that Mother informed her that the January 2018 positive drug screen result was caused by a prescription for stomach medicine. According to Ms. Shelton, although Mother agreed to provide the respective prescription, she never did. During the period that Ms. Shelton was assigned the case, Mother had not completed her parenting classes and had not completed any type

of alcohol or drug treatment. Ms. Shelton attempted to inspect Mother's home but was denied entry because Mother would not answer the door. Ms. Shelton opined that Mother did not trust her.

Upon the request of Mother's trial counsel, a social worker for Quality Care for the Heartland Company, Denee Foisy, become case manager for Mother in June 2017 to assist DCS in providing services to Mother. As such, Ms. Foisy attempted to assist Mother in completing intensive outpatient treatment, parenting classes, and random drug screens. Regarding intensive outpatient treatment, Ms. Foisy gave information to Mother with several providers she could approach to seek treatment. Ms. Foisy explained that Mother ultimately chose Hope of East Tennessee due to its close proximity to her home. Ms. Foisy also assisted Mother in locating parenting classes and further instructed Mother to appear at Hope of East Tennessee once a week to undergo a random drug screen. According to Ms. Foisy, of approximately forty or forty-five occasions she requested that Mother appear for a drug screen, Mother participated in only one drug screen, "and it was only because [Mother] went to [intensive outpatient] intake for East Tennessee and they make you."

Upon Ms. Foisy's determination that Mother needed more intense services, she referred Mother for Department of Intellectual and Developmental Disability ("DIDD") services. With Ms. Foisy's assistance, Mother was approved to receive DIDD services. As such, by trial, DIDD had been providing services to Mother for approximately three weeks and was in the process of determining what additional services Mother needed. According to Ms. Foisy, although she had also attempted to provide Mother with those services, Mother definitely thought she had completed almost everything.

On December 20, 2017, DCS filed its petition to terminate Mother's parental rights to the Child. The trial court conducted a trial concerning the termination petition on March 27, 2018. When Mother did not appear during the trial, her attorney stated that she could not appear because her disability caused her not to "handle these situations very well." Mother's attorney also conveyed having informed Mother that "her hysterical behavior . . . would not be accepted in [the] courtroom." At the conclusion of trial, the trial court terminated Mother's parental rights upon a determination by clear and convincing evidence that (1) Mother had abandoned the Child by failing to provide a suitable home, (2) the conditions which had led to the Child's removal from Mother's custody persisted, and (3) Mother had not substantially complied with the reasonable requirements of her permanency plans. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Mother timely appealed.

## II. Issues Presented

Mother raises one issue for review, which we have restated as follows:

1.      Whether DCS provided reasonable efforts to assist Mother in accordance with Mother's and the Child's specific needs.

DCS has presented two additional issues for review, which we have restated slightly as follows:

2.      Whether the trial court erred by finding clear and convincing evidence to support statutory grounds for termination of Mother's parental rights.

3.      Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*]*,* 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a

complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV.  Reasonable Efforts by DCS

Mother raises as her sole issue for appellate review whether DCS provided reasonable efforts to assist her in accordance with the specific needs of Mother and the

Child. Because reasonable efforts are not a necessary prerequisite to terminate Mother's parental rights, we will address the issue of reasonable efforts by DCS as they apply to the ground of abandonment by failure to provide a suitable home for the Child and the best interest analysis in subsequent sections of this Opinion. *See In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015).

### V. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

> (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:
>
> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's parental rights: (1) abandonment by failure to provide a suitable home for the Child, (2) substantial noncompliance with the reasonable requirements of the permanency plans, and (3) persistence of the conditions leading to the removal of the Child. We will address each statutory ground in turn.

### A. Abandonment by Failure to Provide a Suitable Home for the Child

Mother does not specifically raise an issue regarding the ground of abandonment for failure to provide a suitable home for the Child. However, Mother argues on appeal that DCS did not provide reasonable efforts to assist Mother throughout the time the Child has been in DCS custody. Upon careful review of the record, we disagree with Mother's assertion.

Tennessee Code Annotated § 36-1-113(g) (2017) provides in relevant part:

Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (2017) provides:[4]

---

[4] Effective July 1, 2018, Tennessee Code Annotated § 36-1-102(1)(A)(ii) has been amended to substitute the following language in place of the former version:

(a)     The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)     The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

2018 Tenn. Pub. Acts, Ch. 875, § 3 (H.B. 1856). This amendment is not applicable to the instant action.

The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

For the statutory ground of abandonment by failure to provide a suitable home to be applicable, DCS must first prove that the Child had been removed from Mother's home and that the Child had been found by the trial court to be dependent and neglected. Under the applicable version of the statute, termination of parental rights based upon this ground requires proof that the child was removed from the home of the parent whose rights are being terminated. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *5 (Tenn. Ct. App. Feb. 27, 2015).

Moreover, establishing a suitable home for a child entails more than merely providing an appropriate physical location to reside. *See In re Navada N.*, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016); *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A suitable home for a child requires a safe and stable environment in which the child may reside with a proper caregiver who can provide the appropriate care and attention necessary to meet the child's needs. *See In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017). Additionally, a suitable home necessitates that a home be "'free of drugs and domestic violence.'" *In re Navada N.*, 498 S.W.3d at 596 (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)).

In the instant action, the Child was removed from Mother's home on January 19, 2017. Mother's contention on appeal is that DCS did not provide reasonable efforts to assist her in accordance with Mother's and the Child's specific needs. Pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(ii), DCS must prove that it made reasonable efforts to assist Mother in establishing a suitable home during the four months after the Child was placed in DCS custody if DCS relies on the statutory ground of abandonment by failure to provide a suitable home. *See In re Kaliyah S.*, 455 S.W.3d at 555 n.32. Our Supreme Court has instructed that the court should analyze the reasonableness of DCS's efforts to assist a parent on a "case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d at 601.

After the Child was placed into DCS custody, Cody Kinser was the DCS family service worker for the family from January 19, 2017, through November 2017, inclusive of the first four months the Child was in DCS custody. Mr. Kinser testified that Mother had stable housing during that time and was residing with Grandmother. However, Mr. Kinser expressed concerns that Grandmother also experienced substance abuse issues.

Within the first four months, Mr. Kinser submitted a "PSG," which he described as case services funded by DCS, to obtain funding to pay for a psychological evaluation for Mother. Mother completed the psychological evaluation on March 7, 2017, which was performed by Dr. Brietstein. Dr. Brietstein noted that Mother functioned "at a very low level and appear[ed] to meet the criteria for intellectual disability." According to Dr. Brietstein's evaluation, Mother's intellectual disability contributed to her "poor parenting practices, affecting her ability to make appropriate judgments on [the Child's] behalf." Dr. Brietstein further documented that Mother had suffered a brain injury as a child when she was struck by a vehicle while riding her bicycle. Dr. Brietstein opined that Mother was "antagonistic toward authority figures, including DCS, and [was] generally suspicious and distrustful of other people's motives, which further complicate[d] her ability to benefit from their services."

Based on the foregoing, Dr. Brietstein recommended in his evaluation that Mother complete outpatient drug rehabilitation, parenting classes, and a parenting or bonding assessment with the Child. Due to concerns of drug use, Dr. Brietstein suggested that Grandmother participate in drug rehabilitation and pass drug screens should Mother wish to continue residing with her. In order for Mother to benefit from services, the recommendation included that the parenting classes be provided to Mother at a more basic educational level than typically required. Notably, Dr. Brietstein opined that termination of Mother's parental rights should be considered if Mother failed to successfully complete the recommendations provided.

Mr. Kinser testified that during the first four months after the Child was placed in DCS custody, Mother was afforded the opportunity to request that DCS provide her with

an "additional emergency fund" to assist with utilities or a down payment on a new apartment should she relocate. Mr. Kinser provided Mother with contact information for several housing authorities to list her name for housing because Mother had mentioned relocating from the area. Mr. Kinser further explained that he had submitted PSGs to pay for therapeutic visits with the Child, an alcohol and drug assessment, the psychological evaluation, psychological services, ETHRA transportation, and parenting classes.

During trial, Mother's counsel questioned Mr. Kinser concerning the special accommodations he made with respect to Mother's disability. Mr. Kinser responded as follows:

> I know that at one point we were helping her with a calendar with the dates on it for any kind of appointments. Every single time we had some kind of appointment come up, I would most times send her a text, let her know, hey, this is the date, this is the time it's going to happen, give me a call if you have any questions. Every time I would give her any kind of form or try to explain some kind of service, I would go into great detail and make sure and answer all of her questions every single time to make sure we were both on the same page and that she did understand. Because, you know, I understand that she did have that traumatic brain injury, and I was trying to work my best with that.

Mother previously attended a detoxification program at Centerpointe. Upon Mother's release from Centerpointe, Mother was to complete intensive outpatient treatment, attend AA/NA meetings, and complete aftercare. Mr. Kinser testified that he had explained those requirements to Mother during a meeting to ensure she understood the additional steps she needed to complete. He attempted to assist Mother in setting up a treatment facility to complete her intensive outpatient treatment. Mr. Kinser also maintained regular contact with Mother, offered her random drug screens, and supplied her encouragement and recommendations. Mr. Kinser testified that although Mother had completed a psychological evaluation and an alcohol and drug assessment, Mother had not followed up on the resultant recommendations. According to Mr. Kinser, Mother had also continued using illicit drugs and had been noncompliant with services that were offered to her.

Upon considering the evidence, the trial court determined that while DCS had made reasonable efforts to assist Mother, Mother's failure to make even minimal efforts to improve her home and circumstances demonstrated a lack of concern for the Child such that it was unlikely she would be able to provide a suitable home for the Child at an early date. Upon a thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Mother abandoned the Child by failing to provide a suitable home. We further conclude

that the evidence preponderates in favor of a finding that DCS exerted reasonable efforts to assist Mother inclusive of her special needs. We therefore affirm this statutory ground for termination of Mother's parental rights.

### B. Substantial Noncompliance with Permanency Plans

Mother has not appealed the trial court's determination that clear and convincing evidence demonstrated her failure to substantially comply with the reasonable responsibilities set out in the permanency plans. However, due to the constitutional interests involved in a parental rights termination action and DCS's presentation of statutory grounds as an issue, we have undertaken review of this statutory ground. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

Tennessee Code Annotated § 36-1-113(g)(2) provides as a ground for termination of parental rights:

> (2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

To terminate a parent's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks
> with boxes to be checked off before custody is automatically
> restored. Rather, it is an outline for doing the things that are
> necessary to achieve the goal of permanency in children's
> lives. We think that where return to parent is the goal,
> parents must complete their responsibilities in a manner that
> demonstrates that they are willing and able to resume caring
> for their children in the long-term, not on a month-to-month
> basis.

> *In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8
> (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn.
Ct. App. Oct. 21, 2015).

As previously noted, the trial court removed the Child from Mother's custody on January 19, 2017. According to the respective bench order, the trial court ordered removal because Mother "tested positive for amphetamine and methadone at court today and has been noncompliant with both the order controlling conduct and [the Family Support Services] case in regards to completing drug treatment and making sure the child receives his medication and based upon the unavailability of the father." Mother had stipulated at the hearing that the Child had "improper guardianship at the time of removal by the Mother" pursuant to Tennessee Code Annotated § 37-1-102(b)(13)(F).

On February 9, 2017, DCS developed a permanency plan concerning the Child, which the trial court subsequently ratified on March 7, 2017. Mother participated in the development of the plan. As to Mother, this plan set forth the following responsibilities, which were approved by the trial court as reasonably related to remedying the conditions that necessitated foster care: Mother would (1) participate in therapeutic visitation with the Child; (2) ensure that the Child attended school daily; (3) "remain involved with the school system by attending meetings, talking with teachers, and reviewing progress reports"; (4) provide proof of stable housing; (5) prepare a written transportation plan and provide it to DCS; (6) provide proof of stable income; (7) schedule, participate in, and complete parenting classes and provide proof to DCS; (8) pay child support as ordered by the court;[5] (9) participate in a psychological examination to address educational difficulties in order to assist DCS with providing services to Mother; (10) follow recommendations from the psychological evaluation; (11) submit to random drug screens and pill counts to verify sobriety; (12) participate in and complete an alcohol and drug

---

[5] In its March 7, 2017 order, the trial court determined that Mother did not have an ability to pay child support and suspended Mother's child support obligation.

assessment and follow all recommendations therefrom; and (13) stop use of all non-prescribed medications.

As noted in the previous section of this Opinion, Mother completed her psychological evaluation on March 7, 2017, with Dr. Brietstein who thereupon recommended that she complete outpatient drug rehabilitation, parenting classes, and a parenting or bonding assessment with the Child. Dr. Brietstein further recommended that the parenting classes be provided to Mother at a more basic level.

On September 8, 2017, DCS developed a second permanency plan, which the trial court approved following a permanency hearing on October 10, 2017. Mother also participated in the development of this plan. The second plan included the following responsibilities, which the trial court approved as being reasonably related to remedying the conditions necessitating foster care: Mother would (1) follow the recommendations of her alcohol and drug assessment, (2) continue to participate in random drug screens and pill counts, (3) continue to work on her parenting classes and display learned skills, (4) prepare a written transportation plan and provide it to DCS, (5) obtain and maintain appropriate housing, and (6) work with case management on budgeting and finances.

On October 31, 2017, Mother completed an alcohol and drug assessment. During the intake appointment for her alcohol and drug assessment, Mother tested positive for cocaine, amphetamines, methamphetamine, and alcohol. Consequently, the assessor recommended that Mother complete intensive outpatient treatment, continue compliance with her mental health service provider, participate in a twelve-step program, and participate with an aftercare program.

Mr. Kinser testified that while he was the case manager, he had explained the contents of the permanency plans to Mother and that she presented no indication that she did not understand the requirements of the plans. Mr. Kinser further stated that although Mother had completed a psychological evaluation and an alcohol and drug assessment, she had failed to follow through with the resultant recommendations. Mother attended two out of nine scheduled parenting classes, either failing to appear for the class or cancelling at the last minute in seven instances. According to Mr. Kinser, the greatest barriers to returning custody of the Child to Mother were that she continued to use drugs and had not complied with ordered services.

Having obtained the case in November 2017, Ms. Shelton remained the caseworker at the time of trial when she testified that in November 2017, Mother had yet to complete intensive outpatient treatment, complete parenting classes, or provide proof of a transportation plan. Ms. Shelton also indicated that since she had been the case manager, Mother had participated very little in the requirements of the permanency plan. It is undisputed that upon trial, Mother had failed to complete intensive outpatient drug

treatment as recommended by the psychological evaluation and the alcohol and drug assessment. Mother also had not completed parenting classes or provided a transportation plan to DCS.

Upon a thorough review of the record, we conclude that DCS has proven by clear and convincing evidence that Mother failed to substantially comply with the reasonable requirements of the court-approved permanency plans. We therefore affirm the trial court's determination to terminate Mother's parental rights on this statutory ground.

## C. Persistence of Conditions

The trial court also determined that the ground of persistence of the conditions leading to the Child's removal from Mother's home had been proven by clear and convincing evidence. Again, although Mother has not raised an issue concerning specific grounds for termination of her parental rights, we will review the trial court's finding regarding this ground because of its importance, as well as DCS's presentation of the issue. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Arteria H.*, 326 S.W.3d at 184 (Tenn. Ct. App. 2010).

Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:[6]

---

[6] Effective July 1, 2018, subsequent to the commencement of the instant action, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(3), replacing the former language in its entirety with the following:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

- 17 -

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

A prior court order adjudicating the child to be dependent, neglected, or abused is an essential requirement of a court's termination of parental rights upon the ground of persistence of conditions. *See In re Audrey S.*, 182 S.W.3d at 874. As this Court explained, the statutory ground of persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *Id.*

The trial court adjudicated the Child as dependent and neglected on January 19, 2017, and removed the Child from Mother's custody due to Mother's drug use, noncompliance with DCS Family Support Services in obtaining drug treatment, and failure to ensure that the Child received his medication. By trial, Mother had not completed the reasonable requirements set forth in her permanency plans.

Shortly after the Child entered foster care, Mother completed an inpatient detoxification program at Centerpointe, continuing from January 26, 2017, through February 5, 2017. Following her discharge from detoxification, Mother was to complete intensive outpatient treatment, attend AA/NA meetings, and complete aftercare. According to Mr. Kinser, he had explained to Mother the additional steps she needed to

---

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

2018 Tenn. Pub. Acts, Ch. 875, § 10 (H.B. 1856). This amendment is not applicable to the instant action.

complete and had attempted to assist her in locating a nearby intensive outpatient treatment program. Ms. Foisy also had worked with Mother to complete drug treatment. According to Ms. Foisy, she had instructed Mother to appear at the facility for a drug screen approximately forty to forty-five times, but Mother had participated in only one drug screen during an intake appointment.

Although Mother had completed a psychological evaluation, she had failed to complete the recommended intensive outpatient drug treatment or parenting classes. Throughout the time that the Child was in DCS custody, Mother had continued using drugs and had failed to complete treatment to remedy her drug addiction. The trial court found that the conditions leading to the Child's removal from Mother's custody persisted because Mother had not addressed her substance abuse issues. The court also determined that there was little likelihood that Mother would remedy the conditions soon so that the Child could be returned to her home. Although the Child had been in DCS custody for thirteen months at the time of trial, Mother had failed to address her drug issues.

Having thoroughly reviewed the evidence presented at trial, we conclude that clear and convincing evidence exists to support the trial court's determination that the conditions leading to the Child's removal from Mother's custody persisted. We therefore affirm the trial court's termination of Mother's parental right's based on this statutory ground.

## VI. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (2017) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the

- 21 -

circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Mother has not specifically appealed the trial court's determination that termination of her parental rights was in the best interest of the Child. However, Mother has raised an issue concerning whether DCS had provided sufficient reasonable efforts specific to the needs of both Mother and the Child, which is relevant to Tennessee Code Annotated § 36-1-113(i)(2). Factor (2) allows the court to consider in its best interest analysis: "Whether the parent or guardian has failed to effect a lasting adjustment <u>after reasonable efforts by available social services agencies</u> for such duration of time that lasting adjustment does not reasonably appear possible" (emphasis added). *See* Tenn. Code Ann. § 36-1-113(i)(2). As our Supreme Court has instructed, the court should analyze the reasonableness of DCS's efforts to assist a parent on a "case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d at 601.

The trial court determined that while DCS had made reasonable efforts to assist Mother, she had not made such changes in her lifestyle or conduct such that lasting adjustment appeared possible. In support, the trial court found that despite assistance by DCS, Mother continued to use illegal drugs and had not demonstrated stability such that she could care for the Child. We have previously analyzed whether DCS made reasonable efforts to assist Mother during the four months immediately following the Child's placement in foster care as it relates to the statutory ground of abandonment by failure to provide a suitable home. We will now consider the efforts made by DCS for the duration of the Child's DCS custody and whether those efforts were reasonable in light of the unique facts of this case. *See In re Kaliyah S.*, 455 S.W.3d at 554; *In re Bernard T.*, 319 S.W.3d at 601.

Considerable testimony was presented regarding DCS's reasonable efforts to assist Mother. According to Mr. Kinser, DCS provided funding for Mother to complete a psychological evaluation, wherein Dr. Brietstein recognized that Mother had experienced a traumatic brain injury as a child and that she functioned "at a very low level and appear[ed] to meet the criteria for intellectual disability." Dr. Brietstein opined that Mother was "antagonistic toward authority figures, including DCS, and [was] generally suspicious and distrustful of other people's motives, which further complicate[d] her ability to benefit from their services." In addition to a requirement that Mother complete intensive outpatient drug treatment, Dr. Brietstein suggested that Mother complete parenting classes and that the classes be offered to her at a more basic level than typically

required. Both Mr. Kinser and Ms. Shelton expressed that they had communicated this recommendation to the service providers offering parenting classes.

Mr. Kinser also testified that DCS had provided supervised therapeutic visitation between Mother and the Child, which allowed the service provider to offer Mother direction on parenting skills during the visits. DCS also facilitated an opportunity for Mother to request funding to assist her with utilities or a down payment on a new apartment if she wished to relocate, and DCS had provided her with contact information for housing authorities. Moreover, Mr. Kinser had submitted PSGs for DCS to provide funding for not only the psychological evaluation and the supervised therapeutic visits, but also for an alcohol and drug assessment, psychological services, ETHRA transportation, and parenting classes.

Mr. Kinser explained that he had attempted to provide appropriate accommodations to Mother because he knew that she had sustained a traumatic brain injury as a child. He assisted Mother in preparing a calendar that included the dates for her upcoming appointments, and he sent Mother text messages to remind her of upcoming appointments, explaining what he expected to occur at those appointments. Mr. Kinser further related that he went "into great detail" when he provided Mother with a form and would answer any questions she had. Mr. Kinser also attempted to enroll Mother in intensive outpatient treatment at one point but was informed by the treatment provider that he was not permitted to complete the enrollment for Mother because it was a voluntary program.

As previously noted, Mother was tasked to complete intensive outpatient treatment, attend AA/NA meetings, and complete aftercare upon release from her detoxification at Centerpointe. As Mr. Kinser explained, he had informed Mother of the additional steps she needed to complete and had referred her to an alcohol and drug treatment program in Oak Ridge to fulfil her intensive outpatient drug treatment program requirement. He had chosen this provider due to Mother's transportation issues and because the treatment provider was located within walking distance from Mother's home. Additionally, Mr. Kinser maintained regular contact with Mother during that time, provided her random drug screens, and offered her encouragement and recommendations. Although Mother had completed a psychological evaluation and an alcohol and drug assessment, she had not embraced the resultant recommendations. According to Mr. Kinser, Mother had also continued abusing drugs and had been noncompliant with services.

When Ms. Shelton assumed the case responsibilities in November 2017, Mother had not completed the recommended intensive outpatient drug treatment, parenting classes, or a transportation plan. Ms. Shelton related that she had submitted "multiple PSGs" for Mother to receive parenting classes. She also spoke with Mother about

obtaining transportation or providing Mother with services to assist her with transportation. In addition, she had attempted to assist Mother with gaining intensive outpatient treatment by providing Mother with contact information for several agencies in the area. She had also informed Mother that Ridgeview had openings for treatment and accepted walk-in appointments. According to Ms. Shelton, she had attempted to contact Mother by telephone and text messages, but Mother had not responded.

Despite these efforts by DCS, Mother continued using drugs and had failed to comply with DCS recommendations or the service provider requirements. By the time of trial, the Child had been in DCS custody for thirteen months. During this period, Mother had done very little to address her substance abuse issues, had not completed the recommended parenting classes, and had not developed a transportation plan. Upon a careful review of the record, we determine that although DCS provided significant reasonable efforts to assist Mother throughout the case, Mother made little progress in adjusting her lifestyle or conduct such that the Child could return to Mother's home. Based on the foregoing, the evidence preponderates in favor of the trial court's determination that Mother had not made a lasting adjustment in her conduct despite reasonable efforts by DCS to assist her and that lasting change did not appear likely.

Concerning the best interest analysis as relevant to statutory factor (1), Mother had not made changes to her conduct or circumstances that would make it safe for the Child to return to Mother's home. As noted above, Mother had failed to address her substance abuse issues and had not obtained a stable home to which the Child could return. Regarding Mother's residence with Grandmother, Mr. Kinser expressed concerns respecting drug use by Grandmother. The trial court found that Grandmother had engaged in criminal activity and that she had been recently arrested for possession of methamphetamine. Dr. Brietstein recommended that Grandmother participate in drug treatment if Mother wished to reside with her. Ms. Foisy testified that she offered the same services to Grandmother as she had to Mother. The record contains a dearth of evidence that Grandmother had completed treatment or addressed her own substance abuse issues.

The trial court did not specifically address statutory factors (3) and (4) in its best interest analysis. Regarding these factors, we note that Mother had maintained visitation with the Child throughout most of the case. However, upon trial, Mother had not visited the Child in two months. Pursuant to statutory factor (5), the trial court determined that changing caregivers would have a detrimental effect on the Child. The court specifically found that the Child needed stability and that Mother was unable to provide that security for him. The trial court also found that the Child enjoyed a strong bond with the foster parents and that the foster parents wished to adopt the Child. The trial court determined that the foster parents were "very stable" and could provide the Child with the medication he needed.

The trial court also did not specifically address statutory factor (6), which concerns whether Mother had "shown brutality, physical, sexual, emotional or psychological abuse, or neglect" toward the Child. *See* Tenn. Code Ann. § 36-1-113(i)(6). The record reflects that the trial court determined the Child to be dependent and neglected due to "improper guardianship" by Mother at the time of the Child's removal from her custody. Throughout the case, Mother had continued to abuse drugs and had failed to seek treatment for her addiction. As such, Mother had neglected the Child's needs due to her drug use.

Relevant to factor (7), the trial court found that Mother had continued to abuse drugs, which had rendered her consistently incapable of caring for the Child in a safe and stable manner. Mother had failed a drug screen as recently as January 12, 2018, approximately two months prior to trial. As to factor (8), the court found that Mother's mental or emotional status would prevent Mother from effectively parenting the Child. The court specifically determined that Mother had been diagnosed with "Opioid Use Disorder and Mild Intellectual Disability" that would, without a support system, prevent her from effectively parenting the Child. The court did not address factor (9) regarding whether Mother had consistently paid child support. Although Mother was initially ordered to pay child support, the court found in its March 7, 2017 order that Mother did not have an ability to pay child support.

In the case at bar, the trial court properly considered the statutory factors in concluding that those factors weighed against preserving Mother's parental rights to the Child. Based on our thorough review in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established by the same quantum of proof, we affirm the trial court's termination of Mother's parental rights.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Tora W.

_____
THOMAS R. FRIERSON, II, JUDGE